MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2013 ME 31
Docket:       Cum-12-236
Argued:       February 12, 2013
Decided:      March 21, 2013

Panel:        SAUFLEY, C.J., <u>ALEXANDER</u>, LEVY, SILVER, MEAD, and JABAR, JJ.


D.S.

v.

SPURWINK SERVICES, INC.


ALEXANDER, J.

[¶1]  In this case, D.S., an incapacitated woman, has alleged that in 2004 Spurwink Services, Inc. breached its duty of care to her by allowing her to leave the property of its education facility, which resulted in her being sexually assaulted by two strangers.  We are asked to determine whether D.S.'s claims are subject to the mandatory prelitigation procedures of the Maine Health Security Act (MHSA), 24 M.R.S. §§ 2501-2987 (2012).

[¶2]  D.S. appeals from a summary judgment entered in the Superior Court (Cumberland County, *Cole, J.*) in favor of Spurwink Services.  The court entered a summary judgment based on its determination that it lacked jurisdiction over D.S.'s claims pursuant to the MHSA.  D.S. argues that her claims do not fall within the MHSA and that the court erred in entering a summary judgment against her because (1) Spurwink Services is not a "health care provider" within the meaning

2

of the MHSA, *see* 24 M.R.S. § 2502(2), (6);[1] (2) her claims do not arise out of the provision of or failure to provide "health care services," *see* 24 M.R.S. § 2502(6); and (3) her claims do not constitute claims for "professional negligence," *see* 24 M.R.S. § 2502(7). We agree that the provisions of the MHSA do not apply and therefore vacate the judgment and remand for further proceedings.

## I. CASE HISTORY

[¶3] D.S. was diagnosed in her youth with several disabilities and disorders, including disruptive behavior disorder and depressive disorder and an intellectual disability. In June 2003, upon referral by her local school department, D.S. was admitted to the Spurwink School "Day Treatment Program," also known as the Cummings Program or the Cummings School,[2] located in Portland, for the provision of "necessary emotional, psychological and other therapeutic services and education."[3]

[¶4] According to an affidavit of Spurwink Service's president, Spurwink Services has held at all relevant times a mental health license from the Maine

---

[1] Title 24 M.R.S. § 2502(2) was amended, after the 2010 complaint was filed, by P.L. 2011, ch. 190, § 3 (effective Sept. 28, 2011) (codified at 24 M.R.S. § 2502(2) (2012)). The 2011 amendment provided that a "health care provider" includes a veterinary hospital, which has no bearing on the issues herein.

[2] D.S. alleged in her complaint, and Spurwink Services has admitted, that Spurwink Services owns and operates the "Cummings School," a private school located in Portland.

[3] It appears that D.S actually transferred from another program within Spurwink Services to the Cummings Program in June 2003.

Department of Health and Human Services.[4] Spurwink Services's Cummings Program is approved by the Maine Department of Education to operate as a private school. It is designed to provide a highly structured, therapeutic environment for children and adolescents with behavioral and developmental challenges.

[¶5] The Cummings Program is comprised of six residential homes and an educational day-treatment center serving individuals ages thirteen to twenty years old. All individuals attending the Cummings Program have a primary diagnosis of mental illness, developmental disability, major personality disorder, or a combination of disorders. The Cummings Program has at all relevant times billed MaineCare for "Children's Behavioral Health Day Treatment."

[¶6] When D.S. was admitted to the Cummings Program, she received a copy of the program's policies and rights and basic protections, which included a description of D.S.'s right to an individualized treatment or service plan (ISP). The ISP was to be developed based on D.S.'s individual physical, psychological, educational, and social needs.

[¶7] To develop an ISP for D.S., Spurwink Services arranged for a psychiatrist to evaluate her in December 2003. This psychiatrist is a consulting physician for Spurwink Services, not an employee. The evaluation provided an important piece of information that D.S.'s treatment team used in developing

---

[4] The license itself states that "Spurwink School" is licensed as a mental health agency.

D.S.'s ISP because, as her teacher described it, "[the psychiatric evaluation] tells you what to do." However, the psychiatrist's evaluation did not, in fact, tell Spurwink Services staff "what to do," but made only some "recommendations" for approaches to her treatment.

[¶8] In January 2004, an interdisciplinary treatment team convened to develop D.S.'s ISP. The treatment team included the following Spurwink Services employees: the director of the Cummings Program, who is a licensed clinical social worker; the associate director of day treatment at the Cummings Program, who has a master's degree in special education; D.S.'s teacher; and a licensed clinical social worker assigned to D.S. Other therapists, educators, and case managers attended the meeting, as did Spurwink Services's consulting psychiatrist. Several of these individuals signed off on the ISP, including the consulting psychiatrist who approved it as "appropriate" for D.S.

[¶9] The ISP set goals and objectives for D.S., to be accomplished, in part, by individual therapy. D.S.'s ISP also established procedures relating to D.S.'s care and safety that included not leaving her alone with male staff due to her history of trauma and sexualized behavior and having at least two staff members available due to D.S.'s aggressive behaviors. Spurwink Services also developed a behavior plan for D.S. that approved methods for responding to D.S.'s behaviors, including safety holds when necessary, preferably performed by female staff only.

This behavior plan was developed in 2003 and not as a part of D.S.'s 2004 ISP. According to the behavior plan document, Spurwink Services's consulting psychiatrist was not part of the treatment team that developed the behavior plan.

[¶10]  Spurwink Services also developed an elopement[5] response plan for D.S. in October 2003, which predated both the consulting psychiatrist's December 2003 evaluation of D.S. and D.S.'s 2004 ISP.  D.S.'s social worker participated in the development of D.S.'s elopement response and safety hold plans.  The elopement response plan specified, among other things, that in the event that D.S. left the school, a staff member was to keep her in sight from a distance while another staff member retrieved a vehicle if needed, and then the two staff members were to follow D.S. and attempt to convince her to return to the school.  There is no indication in the summary judgment record that the psychiatrist was consulted in the development of these protocols.

[¶11]  In 2004, D.S. was living in a therapeutic group home in Biddeford. On November 29, 2004, D.S., then sixteen years old, arrived by school bus at around 8:00 a.m. at the Cummings Program, where at least one educational technician was on "bus duty" to greet students.  The educational technician who worked in D.S.'s classroom was already outside or came out as soon as D.S.

---

[5]  "Elopement" is the term used to indicate that a person has run away from the facility.

arrived. D.S. immediately told her Cummings Program educational technician that she was not going to school, and she left the property on foot.

[¶12] The educational technician briefly followed D.S., but stopped and called D.S.'s teacher, who came out almost immediately and got into a car with the program's associate director to look for D.S. The Cummings Program director and D.S.'s social worker also came out to assist and the police were called. D.S. was not located. D.S. alleges that, after leaving Cummings Program property, she approached a vehicle, spoke to a man who invited her into the vehicle, and that she ultimately had nonconsensual sexual intercourse and sexual contact with him and another man.

[¶13] In July 2010, D.S.'s mother, on behalf of D.S. as her parent and legal guardian, filed a five-count complaint against Spurwink Services. The complaint alleged negligence, negligent infliction of emotional distress, breach of fiduciary duty, punitive damages, and violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C.S. § 794 (LexisNexis 2005), although D.S. later dismissed the Rehabilitation Act count. Spurwink Services moved to dismiss the complaint, asserting that the case was governed by the MHSA, D.S. failed to comply with the requirements of the MHSA, and her claims were time-barred under the act. After the court denied Spurwink Services's motion to dismiss, the parties engaged in extensive discovery.

[¶14]  On January 13, 2012, Spurwink Services filed a motion for summary judgment and statement of material facts with supporting documentation, which D.S. opposed.  D.S. also filed a statement of additional facts, to which Spurwink Services replied.  After a hearing, the court entered a summary judgment in favor of Spurwink Services, concluding that D.S.'s claims are subject to the prelitigation procedural requirements of the MHSA, D.S. failed to follow them, and the court therefore was without jurisdiction over her case.  D.S. timely appealed.

## II.  LEGAL ANALYSIS

[¶15]  We review the court's entry of a summary judgment for errors of law, viewing the evidence in the parties' statements of material facts and any record references therein in the light most favorable to D.S. as the non-prevailing party. *See Barr v. Dyke*, 2012 ME 108, ¶ 12, 49 A.3d 1280.  We thus "independently determine whether the record supports the conclusion that there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law." *Id.*

[¶16]  At the heart of this appeal is the interpretation of the MHSA, and its application to the material facts, which, as relevant to this decision, are not in genuine dispute.  "We review the interpretation of a statute de novo to determine whether the successful moving party is entitled to judgment as a matter of law." *Hayden-Tidd v. Cliff House & Motels, Inc.*, 2012 ME 111, ¶ 12, 52 A.3d 925; *see*

*also Hill v. Kwan*, 2009 ME 4, ¶ 9, 962 A.2d 963 (stating that whether subject matter jurisdiction exists is a question of law that we review de novo).

[¶17]  In interpreting a statute, we first examine "the plain meaning of the statute within the context of the whole statutory scheme to give effect to the Legislature's intent."  *Baker v. Farrand*, 2011 ME 91, ¶ 21, 26 A.3d 806.  If there is no ambiguity, we do not apply rules of construction or examine legislative history.  *Dickey v. Vermette*, 2008 ME 179, ¶ 5, 960 A.2d 1178.

[¶18]  The MHSA provides mandatory prelitigation procedural mechanisms for any "action for professional negligence."  24 M.R.S. §§ 2851-2859, 2903(1).  Before a party may commence an "action for professional negligence" in Superior Court, he or she must serve a written notice of claim on the opposing party, file the notice of claim in the court, and present his or her claims in a mandatory prelitigation screening process unless the parties agree to opt out of that process.  24 M.R.S. §§ 2853, 2854, 2903(1); *Hill*, 2009 ME 4, ¶¶ 7-8, 962 A.2d 963.  The question for us is whether D.S.'s claim constitutes an "action for professional negligence" subject to the MHSA's provisions.

[¶19]  The MHSA's language reflects the Legislature's intent that the MHSA "occupy the field" with regard to actions against health care providers or practitioners.  *Saunders v. Tisher*, 2006 ME 94,  ¶¶ 13, 15, 902 A.2d 830 ("[T]he Legislature essentially made the MHSA applicable to *any* case that could implicate

medical malpractice insurance."); *Butler v. Killoran*, 1998 ME 147, ¶ 6, 714 A.2d 129; *Brand v. Seider*, 1997 ME 176, ¶ 4, 697 A.2d 846; *Dutil v. Burns*, 674 A.2d 910, 911 (Me. 1996); *Musk v. Nelson*, 647 A.2d 1198, 1201 (Me. 1994).

[¶20] An "action for professional negligence" subject to the MHSA means (1) "any action for damages for injury or death"; (2) "against any health care provider, its agents or employees, or health care practitioner, his [or her] agents or employees"; (3) "whether based upon tort or breach of contract or otherwise"[6]; (4) "arising out of the provision or failure to provide health care services." 24 M.R.S. § 2502(6).[7]

> A "health care provider" pursuant to the MHSA is
>
> any hospital, clinic, nursing home or other facility in which skilled nursing care or medical services are prescribed by or performed under the general direction of persons licensed to practice medicine, dentistry, podiatry or surgery in this State and that is licensed or otherwise authorized by the laws of this State. . . .

24 M.R.S. § 2502(2). We need not analyze and apply the entire definition of a "health care provider" in the context of this case. Assuming, arguendo, that Spurwink Services did provide at least some "medical services" to participants in

---

[6] It is undisputed that D.S.'s action is for "damages for injury . . . based upon tort." *See* 24 M.R.S. § 2502(6) (2012).

[7] Similarly, the MHSA provides that the purpose of mandatory prelitigation screening is to identify meritorious "claims of professional negligence." 24 M.R.S § 2851(1) (2012). A "claim of professional negligence" means "any written notice of claim served pursuant to section 2903 against health care practitioners and health care providers or any employee or agent acting within the scope of their authority." 24 M.R.S. § 2851(2) (2012).

the Cummings Program, we focus only on the requirement that, to be a "health care provider," the entity must be one in which skilled nursing care or medical services are "prescribed by or performed under the general direction of persons licensed to practice medicine, dentistry, podiatry or surgery in this State." 24 M.R.S. § 2502(2).

[¶21] We discern no legislative intent to expand this definition beyond services prescribed by or performed under the general direction of a person licensed to practice medicine, dentistry, podiatry, or surgery. Spurwink Services appears to suggest that we interpret section 2502(2) to mean that a "health care provider" includes any entity performing such services under the general direction of, for example, the panoply of persons that are included in the separate definition of "health care practitioner." *See* 24 M.R.S. § 2502(1-A).[8] We decline to do so.

---

[8] Title 24 M.R.S. § 2502(1-A) (2012) defines "health care practitioner" as "physicians and all others certified, registered or licensed in the healing arts, including, but not limited to, nurses, podiatrists, optometrists, chiropractors, physical therapists, dentists, psychologists, physicians' assistants and veterinarians." *See* P.L. 2011, ch. 190, § 1 (effective Sept. 28, 2011) (adding "and veterinarians" to this definition).

The term "action for professional negligence" means actions against any "health care provider, its agent or employees" and any "health care practitioner, his agents or employees." 24 M.R.S. § 2502(6). D.S. has squarely brought this action or claim against an entity, acting through "its agents or employees" and has not brought an action or claim against any identified health care practitioner in his or her individual capacity. Thus, contrary to Spurwink Services's contentions, the definition of "health care practitioner" has no application in this case. We distinguish this case from *Hewett v. Kennebec Valley Mental Health Association*, in which we did not interpret or apply the MHSA. 557 A.2d 622, 623-24 (Me. 1989) (holding that the two-year statute of limitations of 14 M.R.S.A. § 753 (1980), applicable to actions for "malpractice of physicians and all others engaged in the healing art" without distinguishing between actions against health care providers and health care practitioners, applied to a claim brought against a mental health association because the association's liability would necessarily be vicarious to that of its staff referenced in the complaint).

[¶22]  In this case, the only individual licensed to practice medicine (or dentistry, podiatry, or surgery) described in the summary judgment record is the consulting psychiatrist, retained by Spurwink Services to evaluate D.S.[9]  This psychiatrist may have directly provided limited medical services to D.S. by performing a psychiatric evaluation of D.S. and providing treatment and therapy recommendations for her, similar to services that might be provided for many special education students.  The psychiatrist's evaluation and recommendations played some role, possibly even a significant role, in the development of D.S.'s ISP by D.S.'s treatment team.  He also attended the treatment team meeting at which D.S.'s ISP was developed and approved the ISP, signing off on it as "appropriate."[10]  The approved ISP provided goals and objectives for the Cummings Program staff in working with and treating D.S.  The psychiatrist played no role in the development of D.S.'s behavior or elopement plans.

---

[9]  It is not seriously disputed that Spurwink Services provided services in the Cummings Program under the general direction of one or more licensed clinical social workers, but pursuant to the plain language of 24 M.R.S. § 2502(2), these licensed clinical social workers are not "persons licensed to practice medicine." *See* 32 M.R.S. §§ 3270, 3271 (2012) (discussing licensure to "practice medicine" by the Board of Licensure in Medicine); 32 M.R.S. § 2571 (2012) (stating requirements to practice osteopathic medicine); 32 M.R.S. §§ 7001-A, 7053 (2012) (providing that social workers and clinical social workers with a "license to practice social work" are licensed by the Board of Social Worker Licensure); *see also* 24 M.R.S. § 2502(3) (2012) (defining a "physician" as "any natural person authorized by law to practice medicine, osteopathic medicine or veterinary medicine within this State").

[10]  The ISP indicates that an ISP must be approved by a psychiatrist or a psychologist; it is unknown to what extent Spurwink Services relied on psychologists rather than psychiatrists to evaluate students and approve ISPs.

12

[¶23] Despite the psychiatrist's evaluation of D.S. and his participation in the planning meeting, the summary judgment record demonstrates conclusively that Spurwink Services did not provide medical services in the Cummings Program that were either "prescribed by" or "performed under the general direction" of this licensed physician. The psychiatrist did not, for example, generally direct the performance of the Cummings Program's medical services on a broader or more day-to-day level, he was not an employee of the entity, and he had no supervisory authority over those who may have been performing any medical services. Nor did his recommendations as a consultant "prescribe" any particular medical services. His evaluation and "treatment recommendations" provided one piece of information that D.S.'s treatment team used to inform its decision-making process in developing her ISP, but that treatment team was interdisciplinary, and many persons signed off on the ISP. In short, the Cummings Program and its staff charged with implementing D.S.'s ISP were not providing medical services prescribed by or performed under the general direction of a physician.

[¶24] Accordingly, the material facts developed on the summary judgment record demonstrate that Spurwink Services is not, as a matter of law, a "health care provider," as defined by section 2502(2) of the MHSA, in providing services to

individuals in the Cummings Program.[11] Although we generally interpret the MHSA broadly, the plain language of the MHSA cannot be interpreted so expansively as to encompass the situation presented in this summary judgment record.

[¶25] Thus, D.S.'s action against Spurwink Services cannot constitute an "action for professional negligence" as defined by the MHSA, and her claims are not subject to the mandatory prelitigation procedural requirements, or to the particular statute of limitations, *see* 24 M.R.S. § 2902, of the MHSA.

The entry is:

> Judgment vacated. Remanded for further proceedings.

**On the briefs:**

> Thomas L. Douglas, Esq., Cooper & Bull, P.A., Westbrook, for appellant D.S.
>
> Mark G. Lavoie, Esq., and Jennifer A.W. Rush, Esq., Norman, Hanson & DeTroy, LLC, Portland, for appellee Spurwink Services, Inc

---

[11] Although Spurwink Services has held a state mental health license at all relevant times, nothing in that license, or in the statement of material facts, demonstrates that that is evidence that Spurwink Services provided skilled nursing care or medical services prescribed by or performed under the general direction of persons licensed to practice medicine, dentistry, podiatry or surgery in this State.

**At oral argument:**

Thomas L. Douglas, Esq., for appellant D.S.

Jennifer A.W. Rush, Esq., for appellee Spurwink Services, Inc.

Cumberland County Superior Court docket number CV-2010-337
FOR CLERK REFERENCE ONLY